Mullett, J.,
delivered the opinion of the court.
*215 The main facts on the part of the respondents are few, simple, and were clearly established before the vice-chancellor, and most of them admitted by the defendants, Wyckoff & Co. From Wyckoff & Co.’s receipts, and from their admissions, it appeared that on the 24th day of November, 1840, they received from the complainants, at New-York, to sell on commission, and as the agents and factors of the complainants, one hundred and four barrels of mess pork, one hundred and thirty barrels of prime pork, a quantity of other pork, a quantity of hams, shoulders, heads, and a quantity of lard, specified in the receipt, all subject to canal charges of $7.69, and the pork subject to inspection charges of $194.03. The controversy between the parties is principally confined to the disposition and account of the one hundred and thirty barrels of prime pork; the examination will, therefore, be limited to that item. It appears that the pork was left in the inspector’s hands, subject to the orders of Wyckoff & Co.; that on the 25th day of March, 1841, Wyckoff & Co. sold the one hundred and thirty barrels of the complainants’ prime pork for $10 a barrel, and received the money for it, and gave their order on Thompson, the inspector, for the pork, who delivered it on the order to the purchasers, Wilson, Donnelly & Co.; that the proceeds of the one hundred and thirty barrels of pork were not credited to the complainants, but that Wyckoff & Co. afterwards, in their correspondence with the complainants, represented their one hundred and thirty barrels of prime pork as being on hand, unsold, until March, 1842, at which date they rendered an account to the complainants of the sales of their pork, lard, &c., crediting them with the proceeds of one hundred and thirty barrels of prime pork, sold to a Mr. J. Folger, at $5.38 a barrel. These facts are admitted by Wyckoff & Co., but they attempt to explain them by saying that the one hundred and thirty barrels of the complainants’ prime pork were not sold on their account, but on account of some other *216 person; and that they, Wyckoff & Co., substituted for the complainants’ one hundred and thirty barrels of prime pork, other one hundred and thirty barrels of pork of the same quality, and in better condition for keeping, and held the substituted pork for the complainants until March, 1842, when it was sold for $5.38 a barrel, and the complainants credited for that amount; that being the best price that could be obtained at that time. It is not claimed, and cannot be pretendéd, that a right to dispose of the com-' plainants’ property on the account of another, and substitute other property for it, and to hold the substituted property for a future sale, at the complainants’ risk, is derived from their general powers, as commission merchants, agents or factors, to sell on commission; but the defendants insist that the pork sold to Wilson, Donnelly & Co., although the identical property left by the complainants, was not practically and in business contemplation their property; that their pork, by being stored in the inspector’s store-house or yard, with a large quantity of other pork of a similar inspection brand, and all consigned to- the defendants for sale, lost its identity, like wheat mixed in a bin with other wheat; and that so long as the defendants had on hand one hundred and thirty barrels of prime pork, they might apply the complainants’ ownership to that pork, and sell it on their account. The rule referred to by the defendants’ counsel applies only to cases where the property by the mixture does in fact lose its identity, and becomes incapable of specific designation; or where, by the terms of the the owner parts with his property, and takes a promise of substitution. In such a case thé owner parts with his property as he parts with the means of identifying or controlling it; and the person to whom it is delivered, instead of being a bailee, becomes a debtor. (Norton v. Woodruff, 2 Comst., 153, and the cases there referred to.) In the case under consideration, the property was delivered to the defendants as commission merchants, agents and factors, *217 to be sold for the complainants, which is a bailment. The property was packed in barrels, which were marked so as to identify it as the complainants’ property. The defendants had agreed to take particular care of this identical pork, and, if necessary, to rebrine and repack it; and finally, when they sold it, drew their order on the inspector for the identical one hundred and thirty barrels of pork bearing the complainants’ mark, and now claim that they sold it because it was the plaintiffs’ pork. There is certainly no reason for pretending that there was a confusion or mixture of the property. The ground taken by the defendants’ counsel falls nothing short of claiming for every commission merchant, agent or factor, with whom property is deposited to be sold, the right of converting the property to his own use, and, instead of bailee, to assume the character of debtor to the owner for his property, without his consent. Such an assumption is not tolerated by law, nor can the fair business transactions of the country endure it. The owner may trust the integrity and fidelity of a bailee to sell and account for his property, when he would not be willing to involve it in the pecuniary embarrassments of a speculating, and perhaps insolvent agent. The owner of property, by depositing it with a bailee for sale, does not lose the ownership and control of his property. He may reclaim it from the bailee by paying his lien upon it before it is disposed of. He may secure himself against the casual loss of the property by a particular insurance on it. He may follow it into the hands of a person who has unlawfully obtained the possession of the property, or assumed a control over it inconsistent with his rights, or he may sell it himself; all of which are valuable rights, which he does not surrender by leaving the property with an agent to sell, and of which he cannot be deprived without his consent.
The defendants next claim that they had instructions from the complainants to make such a disposition of the *218 pork as they did make; and also that the complainants, after the transaction, approved and ratified it. These present questions of fact, the affirmative of which is with the defendants, and the burden of proving which rests on them. These facts have all been submitted to the vice-chancellor, who, upon proof upon both sides, found them in favor of the complainants. The counsel for the defendants complains that the vice-chancellor did not give the answer of the defendants under oath upon this subject due weight and consideration. The answer was called for by the complainants, and is, therefore, to be regarded as testimony of their witness. The interrogatories in the bill, calling for an answer on the subject of instructions and authority, are as follows: “ If they shall set up and pretend that they, the said Henry Wyckoff & Co., exchanged the said, one hundred and. thirty barrels of pork, so sold to the said Wilson, Donnelly & Co., for other pork, by or under the authority of your orators, that then they may set forth such authority 5 and if they shall pretend that such authority is contained in any letter or letters from your orators, then that they may set forth such letters.” To this interrogatory as to the authority to make the exchange and substitution: “The defendants, Henry Wyckoff and Charles Burkhalter, answering say, that when the said pork mentioned in the complainants’ bill was consigned and delivered to the said Henry Wyckoff & Co., as commission merchants aforesaid, Alonzo Seymour, one of the complainants, had an interview with these defendants, Wyckoff and Burkhalter, and gave them personal and particular instructions to keep a good watch upon said pork that it did not spoil, and then stated that a part of it was still-fed pork, and that he was fearful that the same would not keep, and if there should appear to be any danger of its depreciating in quality, or if the same should have need of being rebrined, that the said firm of Henry Wyckoff & Co. must attend to it, and have it overhauled and rebrined, or have some arrangement *219 made with it so that the complainants should not hold injured or spoiled pork, when they should select-a market; and that the said Henry Wyckoff & Co., to that end, must do with the same in like manner as if it were their own. And these .defendants further say that the same directions and instructions of the complainants have been repeated in substance, verbally and by letter, and at frequent times subsequent to the consignment of said pork, as in part appears by two certain letters of the complainants now in possession of these defendants, ready to be produced and proved, as this honorable court shall direct, and to which, when produced and proved, these defendants crave leave to refer; a copy of which letters is as follows:
“ ‘ Messrs. H. Wyckoff & Co.:
“ ‘ Gents: We send you the above draft according to arrangement, which -you will please to accept, with our thanks, &c.
“ ‘ G. Merrill & Co.
“‘P. S.—If you think it any speculation to sell our prime pork at the price you can now get, and buy again after navigation opens, and hold on to that instead of this, we wish you to do it for us, as we want to get out of it without a loss, &c.
“ ‘ Yours, &c.,
“ ‘ G. M. & Co.’
“‘Geneva, May 3, 1841. “‘Messrs. H. Wyckoff & Co.,
“ ‘ Gents: We wish our pork to be all overhauled and thoroughly examined, and see that every barrel is full of good strong brine, &c. You will please to attend to it and oblige
“ ‘ G. Merrill & Co.’ ”
*220 This is all the authority which the defendants are able, by their' own statement, to show for the exchange of the complainants’ pork and the substitution of other pork. It seems to me quite clear that all this conversation and these communications, except the “P. S.” to the letter without date, relate to the keeping, watching and preserving the complainants’ own pork, and that in.the doing of which the complainants wished the defendants to do as they would with their own. The “ P. S.” to the letter without a date, it is true, as it appears here, seems to give the defendants a discretion to sell the complainants’ pork and to purchase again after navigation should open f and if the defendants acted under this instruction there would be some pretence for claiming that they supposed themselves authorized to make the exchange and substitution. But the complainants show that, in a letter from Wyckoff & Co. of the date of the 16th of February, 3843, more than a month before they sold the one hundred and thirty barrels of pork to Wilson, Donnelly & Co., in answer to a letter received from the complainants of the twelfth instant, Wyckoff & Co. say: “ We do not feel competent to advise you in the disposition of your pork. ■ We are desirous that you should have the benefit of the highest price of the coming season, but you can judge of the best-time to sell as well as ourselves, and we will do as you wish in regard to the sale of it. In regard to advancing money until next fall, in case you conclude to hold oh to that time, you can draw on us for the amount of your draft (due the 30th March) about the time it becomes due, for 90 days or 4 months, and remit us the proceeds of the same, and we will then hold on to the pork until next September or October if you wish us to do so.” As to the “ P. S.” to the letter which appears in the defendants’ answer to be without date, the defendants, in their letter of April 15th, 1841, addressed to the complainants, say : “ Tour letter of the 16th inst., inclosing a draft for $2908, was received the 8th inst., and credited to your account;” *221 and in a postscript to this letter they say: “ We would not advise selling now with the view of buying again, the market being fluctuating and uncertain.” This letter is also in substance admitted to be dated the fore part of April, by the defendants, in their answer, in several instances. So that the defendants’ authority for selling and exchanging the complainants’ prime pork is reduced to this: They received it, for sale on commission, on the 24th day of November, 1840. On the 16th day of February, 1841, they decline taking a discretionary power over the sale of the pork, but refer the disposition of it to the complainants, promising to do as the complainants wished in regard to the sale of it, and promising, on certain conditions, to keep the pork until the next September or October. On the 25th day of March, 1841, without any further communication with the complainants, they sold the one hundred and thirty barrels, to Wilson, Donnelly & Co., for $10 a barrel, and took the money for it, and on the 8th of April, 1841, when conditionally authorized by the complainants to sell their pork and purchase again when navigation should be opened, if they thought it any speculation to do so, advised them not to do so, and yet they claim that what they had done in March preceding was done by virtue of the plaintiffs’ permission of the 8th of April, which they declined to act under, but advised the defendants not to sell. The defendants had therefore no discretionary authority in the matter. Nor does the defendants’ pretence of the substitution in fact of other pork for the complainants’ pork appear much better sustained by the defendants’ answer. The special interrogatories on this part of the case require the defendants, “ if they shall set up that any such exchange was made, that they shall set forth and discover whose pork or what pork they set apart, designated and identified as the property of the complainants, in the place of the 130 barrels of their pork delivered to the said Wilson, Donnelly & Co., and that they describe and set forth the brands or other distinguish *222 ing marks of th,e 130 barrels so kept in place of the .130 barrels delivered, to Wilson, Donnelly & Co., and the place where the same was kept; how and in what way the same was known or distinguished as the property of the complainants." The defendants in their answer do set up that such .exchange was made; but in their answer to these special interrogatories they say that they “ did, when said 130 barrels of prime pork, originally consigned by the complainants, were delivered to the said Wilson, Donnelly & Co., as aforesaid, distinguish as the property of the complainants other 130 barrels of like pork, and that Henry Wyckoff & Co. always had said quantity of pork ready for sale and delivery, as the property of the complainants, from the time of said sale to Wilson, Donnelly & Co. down to the time of the sale mentioned in the said account of sales; although the defendants admit the same was not separated from other quantities Of pork held by the defendants, they having kept all consignments stored together.” And they further say “ that,, from the fall of 1840 to the spring of 1842, they had on hand large quantities of pork from a great number of consignors, part of which was stored with Thompson & Seguin and part with Martin & Waters, of New-York city; and the pork substituted and replaced, as the property of the complainants aforesaid, was an equal number of barrels of this large quantity, so held as aforesaid ; and it was well understood by all the members of the said firm of Henry Wyckoff & Co. that the complainants had on consignment in said quantity 130 barrels of prime pork and 104 barrels of mess pork, but at this distance of time it is impossible for the defendants to set forth the brands or other distinguishing marks thereof, but the same was known and distinguished, by the defendants, as the property of the complainants, by books of the defendants, which credited them with said quantity of pork, and by the knowledge of the defendants, Henry Wyckoff and Charles Burkhalter, of the delivery of that originally con *223 signed by the complainants to supply a sale made on behalf of another consignment, as aforesaid.”
The substance of all the defendants’ answer, as well to the general statement of the bill as to the particular interrogatories in reference to the substitution of other pork for the one hundred and thirty barrels of the complainants’ pork, sold and delivered to Wilson, Donnelly & Co., is, that when they delivered the complainants’ prime pork to W., D. & Co., the defendants had a large quantity of like pork on hand from other consignors, some of which was stored with Thompson & Seguin and some with Martin & Waters, and they gave the complainants credit on their books for one hundred and thirty barrels of like pork, of this large quantity, without separating it from the large quantity so on hand, or identifying it by any brands or other distinguishing marks, but that the same was known and distinguished by the defendants as the complainants’ pork by their books, which credited the complainants with said quantity of pork, and by the defendants’ knowledge that they had delivered the complainants’ pork to supply a sale made on behalf of another consignment; and that they, during all the time, had on hand a sufficient quantity of like pork, belonging to other persons, ready for sale or delivery as the property of the complainants. Such kind of substitution, even if the defendants had power to make an exchange, did not give the complainants any property in any particular pork, nor vest in them any of the rights of ownership. It was a mere substitution of the defendants’ responsibility for the complainants’ property, and was altogether inconsistent with the relation which existed between the parties, and with the duties of the defendants as commission merchants, agents or factors. In the case under consideration the defendants may have been governed by fair and honest motives, but such transactions will fit other motives equally well. The assumption of such a power by commission merchants, agents or factors, is not warranted by law. It *224 was nothing less than an illegal conversion of the complainants’ property by the defendants to their own use.
\ The last branch of the defence was an alleged approbation and ratification by the complainants of the defendants’ transactions in reference to the sale and substitution set up by them. The principle relied upon to sustain this point is stated by Vbrplanck, senator, thus: “ When a principal, upon full knowledge of all the circumstances of the case, deliberately ratifies the acts or conduct of an agent who has exceeded his lawful authority, or assumed an unauthorized agency, the principal will be bound thereby as fully as if the agent had been expressly empowered for such purposes.” (Delafield v. The State of Illinois, 26 Wend., 192.) The language of Chief Justice Best, in the case of McLean v. Dunn (4 Bing., 722), is to the same effect. And the same principle is recognized by our supreme court, by Bronson, J. (2 Hill, 175), and by Beardsley, J. (7 Hill, 128). In the case of Owing v. Hull (9 Peters, 629), Mr. Justice Story states the principle upon which a ratification is founded as follows-; “No doctrine is better settled, both upon- principle and authority, than this; that the ratification of an act of an agent, previously unauthorized, must, in order to bind the principal, be with a full knowledge of all the material facts. If the material facts be either suppressed or unknown, the ratification is treated as invalid, because founded in mistake or fraud.” It is true this knowledge of the principal may be proved by any legal means of establishing a fact, but it must be proved in some way by the party insisting on the ratification. How did this fact stand proved in the case under consideration ?
There is no proof that the defendants informed the complainants of the sale of their one hundred and thirty barrels of pork to Wilson, Donnelly & Co., and the substitution of other pork in its place, at the time of the transaction, which they ought to have done, for the purpose of apprising them of their ownership and dominion over the substituted pro *225 perty. When, on the 16th day of February,. 1841, the defendants wrote to the complainants, declining to advise them in reference to the disposition of their pork, and promising to do as they wished in regard to the sale of it, they were silent on the subject of the sale and substitution. In their letter of April 15th, 1841,' in answer to the complainants’ letter of April sixth, which was received on the eighth, the defendants say: “Wé would not advise- selling now with a view of buying again, the market being fluctuating and uncertain but they give no information of the salé of the one hundred and thirty barrels and the substitution of other pork in the place of it. In their account of' sales of merchandise, by Henry Wyckoff & Co., tin account and risk of Messrs. G> Merrill &. Co., which they rendered to the complainants, dated July 15th, 1841, they represented the one hundred and thirty barrels-of prime pork as unsold, and in their letter accompanying the account*- and dated July 16th, 1841, they acknowledge the receipt of the complainants’ letter of, the fourth instant, and say that,, agreeably to the complainants’ request, they therewith, send them an account of sales of so much of their pork and lard, &c., together with a statement of the quantity remaining on hand unsold, and promised to write them as soon as any of their pork might be sold.. Although Wyckoff & Co. received, the complainants’ letter of the date of May 3d, 1841, saying: “ We wish our pork to be all overhauled and thoroughly examined, and see that ■ every barrel ■ is full of good strong- brine; you will please to' attend to it and you will oblige us;” it does, not appear that they informed the complainants of the transaction which they now pretend was adopted for the very purpose of saving the complainants from the necessity and expense of having the pork repacked.. In fact, it does not appear, from any evidence in the cause, that Wyckoff & Co. ever informed the complainants of the sale and substitution now set up by them until they made the disclosure in their answer. The *226 only evidence given, on the part of the defendants, to contradict their clearly established suppression of the facts in reference to the sale of the one hundred and thirty barrels of the complainants’ pork to Wilson, Donnelly & Co., and the substitution of other pork in its place, is the testimony of Gr. W. Cromwell, by which it appears that, as he was about going to New-York, in April, 1841, the complainants requested him to call on Wyckoff and say to him that they wanted to have their pork reinspected, or to have it overhauled and rebrined, so that it would be in order for keeping; that he arrived in New-York in the latter part of April and stayed there three weeks; that soon after his arrival, and in the month of May, 1841, he did call on Wyckoff and deliver the verbal message which he had been requested to deliver to him; that Mr. Wyckoff replied that he had parted with the pork and had other pork in the place of it, and the complainants need not give themselves any uneasiness, or something to that effect; that on his return to Geneva, in the month of May, he communicated Mr. Wyckoff’s reply to one of the complainants and he did not express any dissatisfaction. Mr. Cromwell was not authorized to make any inquiries about the disposition of the pork, nor to do anything in the matter but to inform the defendants that the complainants wished to have their pork repacked and rebrined, which request they also communicated to the defendants, by letter, the third day of May, which must have been while Mr. Cromwell was in New-York,, if he is correct in his dates. The reply of Mr. Wyckoff did not state when, how, or in what manner he had disposed of a part of the complainants’pork, nor what part; and not being sent by Wyckoff as a message or information to the complainants, the communication of it by Cromwell, who was not employed to obtain any information on the subject, can hardly be considered as giving them such full knowledge of all the material facts of the defendants’ transaction as to be the foundation of a ratification, or even to justify a suspicion *227 that confidential agents, who had declined taking any advisory control of the subject of the agency, but promised to do as their principals wished in relation thereto, and to inform them of their proceedings, were transcending their authority; and if the complainants had any suspicion of the improper conduct of the defendants in reference to the disposition of the one hundred and thirty barrels of prime pork, it must have been overcome by the account and letters of the defendants,' furnished, at request, the 15th and 16th of July, 1841, in which they represented the one hundred and thirty barrels of prime pork as unsold. It appears to me that the communications of Wyckoff & Co., in the case under consideration, were entirely destitute of the frankness and fairness which onght to characterize the communications of agents with their principals on the subject of their agency, and were calculated to suppress, rather than to convey to the complainants, a knowledge of the defendants’ acts as agents.
I am of opinion that the supreme court decided correctly in sustaining the decree of the vice-chancellor, and am therefore for affirming the judgment appealed from.
Judgment affirmed.